UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

Case Number: 17-20745-CIV-MORENO

RAYMEL VICIEDO VALERO,

    Petitioner,

vs.

CLAUDIA CADELO DE NEVI,

    Respondent.
_____/

## **FINAL ORDER**

Like most custody disputes, this case cries out for a resolution to be dictated by the parties who have the most to gain and lose—the parents. But like most custody disputes, the decision over the life of a child—in this case, 3½-year-old Carlos Felipe Viciedo Cadelo—is to be made not by those who love him—Petitioner father and Respondent mother—but by a stranger—a judge who has taken an oath to uphold the law. In this case, the applicable law is the Hague Convention on the Civil Aspects of International Child Abduction, signed by the two countries in question here: Canada and the United States; and the International Child Abduction Remedies Act of 1988, 42 U.S.C. §11603(b), passed by the United States Congress to implement the Hague Convention. The treaty dictates whether the custodial battle should be fought in a state court in Florida where the mother, Claudia Cadelo De Nevi, now lives or by a court in Quebec, Canada where the father, Raymel Viciedo Valero, has resided. And the heart-wrenching permanent ruling is to be made by this federal judge in Miami.

The federal judge does not decide where the child will be better off, whether: (1) in Miami, where he presently receives needed care from professionals and a loving mother, who is a Cuban national and has sought asylum in the United States after fleeing Canada where she lived, on and off, for more than a year near the child's father; or (2) with the child's father, also a Cuban national who works in rural Quebec and now lives in a small town, Drummondville, after residing in a very small village, Saint-Guillaume, on and off, with the mother and child.

Rather, the narrow issue before this Court is to decide: (1) if the mother wrongfully removed the child from Canada in late September 2016; and (2) if so proven by the father petitioning for the child's return to Quebec, whether the mother has met her burden to prove that the return of the child would cause great risk of physical or psychological harm to the child.

## I. THE LAW

The Hague Convention requires Petitioner father to prove, by a preponderance of the evidence, three elements: (1) the habitual residence of the child immediately before the date of the alleged wrongful removal; (2) whether the removal was in breach of the father's custody rights under Canadian law; and (3) whether the father exercised custody rights at the time of the alleged wrongful removal. If the father proves the facts to support those three elements, then Respondent mother has the opportunity to prove, as an affirmative defense under Article 13(b) of the Hague Convention, that there is a grave risk that the child's return to Quebec would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation. Respondent mother opposing the child's return to Canada bears the burden of establishing the grave risk exception by clear and convincing evidence. *See* 42 U.S.C. §11603(e)(2)(A).

## II. THE FACTS

Most of the facts are undisputed. The father is a Cuban national who has become a resident in Quebec, Canada. The mother is a Cuban national who now seeks political asylum in the United States, but previously lived with the father and their son in Quebec, Canada from March 25, 2016 to September 20, 2016 before she removed the child to the United States. Before that six-month stay in Quebec, the mother had already lived in Canada from November 14, 2015 to January 18, 2016; from September 24, 2015 to October 26, 2015; from February 7, 2015 to March 2, 2015; and from March 23, 2014 to September 21, 2014.

The mother travelled back and forth from Canada to Cuba to receive cancer treatment, which unfortunately resulted in the death of the couple's second unborn child. The dates of the mother's stays in Canada are not in dispute, but their legal significance on a Canadian visitor's visa was hotly debated.

The parties also disputed the couple's living conditions while in Canada; the amount of financial support provided by the father; the existence of healthcare insurance in Canada; the availability of therapists for the child and how to pay for therapy; and the degree of deterioration of the unmarried couple's relationship. As in most custody fights, the unfortunate role of the lawyers was to present all the negative aspects of each parent. And that they did. Thus, the father was presented as a controlling individual, obsessive over neatness and order in his two-bedroom apartment. He was shown to be authoritative, demanding, and somewhat arrogant, and during a three-day visit by a friend, Paloma Duong from Boston, as an ungracious host. The father spent money on his cars and paid the rent when the couple separated, but at the very end of the mother's stay in Canada bought food from the benefits received from the Quebec authorities provided for the child's welfare.

On the other hand, the mother was shown as a woman who used some of the child's welfare money to travel to Cuba with the child. She did not like living with no car in a village in rural Quebec with one main road and 1500 inhabitants, no major supermarkets, and substantial isolation compared to metropolitan Miami. She testified that there is plenty of food in Quebec compared to Havana, but of course, that Miami is better than both.

### III. FINDINGS

#### A. Habitual Residence

The Court easily finds that the habitual residence of the child before his removal by the mother in late September 2016 was Quebec, Canada. The mother's attorney complained throughout the trial and in closing argument that the mother's habitual residence at the time of the alleged removal was in Cuba. It is undisputed that the mother had a physical residence in Cuba and received medical treatment in Cuba, where both parents and the child were born. But, both parties agreed that Cuba, which incidentally is not a signatory to the Hague Convention, was a country that both parents abandoned and a country where neither parent wants to exercise parental rights. Thus, the Court declined to hear more evidence about Cuba. The mother's counsel argued that since the alleged habitual residence of the child was Cuba at the time of the removal from Canada, then this Court is powerless to rule under the Hague Convention. However, the Court need not reach the issue of the residency in Cuba because neither the mother nor the father exercised custodial rights there. It is undisputed that both parents are Cuban political refugees who abandoned Cuba for obvious reasons.

Therefore, consistent with *Mozes v. Mozes*, 239 F.3d 1067 (9th Cir. 2001), it is clear that the child's habitual residence is Canada and the Court need not decide the hypothetical issue of possible dual habitual residence.

It is true that the mother had a Canadian travel visa throughout her six-month stay in 2016, her approximately four-month stay in 2015, and her intermittent eight-month stay in 2014. Although it is a factor to consider, the denial of a permanent residency petition is not dispositive, especially when considering the mother's clearly stated testimony of her longstanding intent to take residence in Canada. In addition, the father, a Canadian legal resident, is also seeking residency not just for his child but for the mother of the child, for whom the father has agreed to continue to sponsor the residency even after the break-up of their relationship.

The Court also finds that the child's removal by the mother in September 2016 was in breach of the father's custody rights as the father had indicated that he may have to go to court in Canada to resolve the child's eligibility for insurance coverage. Counsel for the mother, in closing argument, pointed out the lack of proof in the claims made in the original petition for the child's return to Canada, and it is true that some of the allegations in the petition were not proven. But that happens in many civil cases. A petition is made, a complaint is filed, and when you hear the evidence, it conforms to the petition. The law is clear. The facts include whatever is presented at the hearing. Then, the Court analyzes what was actually presented. It is of no moment that more was claimed in the original petition because not enough information was known at the time. It is more important to determine how the facts presented during three days of trial apply to the issues at hand.

B. **Custodial Rights**

The decision on whether the father was exercising custodial rights at the time of the alleged wrongful removal is a bit more difficult. The Court focused on the last six months in Canada, but also considered the approximately 1.5 years before the relationship soured. Obviously, the parents were happy in the beginning. If not, the mother would not have gone to

-5-

Canada in the first place. She probably would have come to the United States like hundreds of thousands of other Cubans.

The 14 photographs admitted into evidence show a father playing with his son, camping with him, and enjoying leisure time. The Court agrees that those activities do not depict the main duties of a parent. The main role of a parent is to take care of the child, which can include disciplining, feeding, changing diapers, teaching them how to use the bathroom, etc. There is no question that historically it is unfair that such burden falls more on mothers than fathers. Society is indeed changing and every couple does things differently. But the Court, in deciding the exercise of custodial rights, does not determine who does more housework or who does more things with the family. Those disputes are decided by judges having jurisdiction over custodial rights of separated parents. I admire those judges and do not envy the challenges that they face on a daily basis—challenges that I remember confronting 27 years ago.

C. **Grave Risk of Abuse**

The photographs admitted into evidence indicated that the father and son had a good relationship in the past. The Court was glad that the mother's lawyers convinced it, over the reluctance of the father's lawyer, to bring the son into the courtroom. The Court was comforted to see the child come into the courtroom smiling. When the Court asked the mother to put down the child on the floor, he extended his arms toward his mother, confirming his good relationship with the mother, a fact that has never been disputed. But then, in Spanish, the Court asked the child, "where is your father?" The child turned around, and much to everyone's surprise, smiled, recognized him, went to him, and gave him a hug.

The Court was indeed surprised, not because of any harm that has occurred in the past, but just that at that age, after a period time without his father, particularly without visitation, a

child may forget a parent. Yet, this happy father carried his son and gave him high fives, and the child appeared to be happy.

The father's request for resident status for both the mother and the child is evidence of the exercise of his custodial rights, irrespective of whether he now has another girlfriend, is reluctant to pay for health insurance in Canada, is frugal in providing more financial support for his child, or selfishly spends some of the money on new cars as opposed to the child. It is for Canadian authorities in Quebec to resolve those controversies. It is not for a Hague Convention federal judge unless it rises to a level of clear and convincing evidence on the affirmative defense of grave risk of danger to the child.

Having found that the child was wrongfully removed by the mother, the Court finds that the mother has not proven by clear and convincing evidence the grave risk exception. The higher number of therapists and medical professionals in Miami when compared to the village of Saint-Guillaeime or the larger town of Drummondville in Quebec is not enough to preclude the prompt return of the child to Quebec. Nor is the payment for or availability of insurance in one province versus another or in one state versus another.

The facts of this case do not include any evidence of violence toward either the child or the mother. There was testimony of continued sexual relations between the parents and the demands for more sex which were rebuffed by the mother. There was also credible evidence that the father would send his 3½-year-old son to his bedroom as punishment and turn off the lights and that the boy would cry himself to sleep. Such discipline of a toddler may be unwarranted, but does not rise to the level of the cases precluding return of a child to a war-torn country, or a residence with a violent sexual abuser or physical abuser, or even a drunk, unstable father.

Again, if any restrictions on visitation or custodial rights are to be imposed, they are to be imposed by a Canadian court. Likewise, if the mother is indeed "submissive" and the father is abusive, as her counsel argues, then that issue of protection is to be determined by a Canadian judge and not this Court.

Over a decade ago, this Court was faced with ordering the return of three children removed by a recently widowed father from Ireland to Ft. Lauderdale, Florida. The Eleventh Circuit in *Hanley v. Roy*, 485 F3d 641 (1th Cir. 2007), held that the petitioning grandparents should have prevailed in their request to return their three grandchildren to Ireland. The mother was dead, the father was a widower, and the children lived in Ireland with the grandparents for a time. The children had to return to Ireland for an Irish court to determine the grandparents' custodial rights. There are, of course, differences with this case because of the Irish law on custodial rights. Yet, this Court in the decade since, has not relished the numerous Hague Convention challenges to decide as instructed by the Eleventh Circuit, but will continue to do the same as it must. Under the facts presented, the rule of law requires the return of the child, hopefully with his mother, to Canada for a court in Quebec to determine the custodial rights of both parents, where they lived prior to the absconding to America.

## IV.  CONCLUSION

Our most recent Supreme Court Justice Gorsuch, before being elevated to the Supreme Court, said that if a judge felt good about every decision he made, he probably was not being a good judge. A Hague Convention custodial dispute may be one of the cases that does not feel good. Yet, a judge must decide the case based on the law.

After conducting an evidentiary hearing over three days, where both parents were represented by vigorous, well-prepared, tenacious advocates, and where the parents testified, the Court finds that the child was wrongfully removed and that his return to Quebec, hopefully with

-8-

his mother, is unlikely to cause the psychological or physical harm that is required by law to prevent his return.

It is therefore ordered that the child, Carlos Felipe Viciedo Valero, be returned to Quebec, Canada no later than **September 21, 2017**. The parents should make arrangements to obtain the appropriate documents for the entry of the child and mother. Failure of the mother to abide by this order shall result in contempt proceedings. A Final Judgment in favor of Petitioner father shall be entered.

DONE and ORDERED in Open Court in Miami-Dade County, Florida this 17th day of August, 2017 and signed this _25_ day of August, 2017.

_____
FEDERICO A. MORENO
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record